1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT FOR THE

7                         EASTERN DISTRICT OF CALIFORNIA

8

9   RAFAEL MONTEJANO QUIROZ,        )        No. CV-F-04-6370 REC
                                    )        (No. CR-F-99-5060 REC)
10                                  )
                                    )        ORDER DENYING MOTION TO
11                  Petitioner,     )        VACATE, SET ASIDE OR CORRECT
                                    )        SENTENCE PURSUANT TO 28
12        vs.                       )        U.S.C. § 2255 AND DIRECTING
                                    )        ENTRY OF JUDGMENT FOR
13                                  )        RESPONDENT
    UNITED STATES OF AMERICA,       )
14                                  )
                                    )
15                  Respondent.     )
                                    )
16  _____)

17       On October 5, 2004, petitioner Rafael Quiroz timely filed a

18  MOTION to vacate, set aside or correct sentence pursuant to 28

19  U.S.C. § 2255, contending that he was denied the effective

20  assistance of counsel at the plea negotiation/plea offer stage.[1]

21       The court ordered petitioner to file a waiver of the

22  attorney-client privilege in connection with the claims made in

23  this MOTION.  The court also ordered the United States to respond

24  _____

25       [1]Petitioner also contends that the court increased his
    sentence in violation of <u>Blakely v. Washington</u>.  However, the court
26  has denied this claim by Order filed on October 7, 2004.

                                    1

to petitioner's claim, giving petitioner 30 days thereafter to file a reply brief.  The United States' opposition was filed on January 27, 2005.  Petitioner has not filed a reply. Consequently, all briefing now being complete, the court issues its rulings as set forth herein.

The standards governing an assertion of ineffective assistance of counsel are set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  As explained in <u>United States v. Quintero-Barraza</u>, 78 F.2d 1344, 1348 (9th Cir. 1995), <u>cert. denied</u>, 519 U.S. 848 (1996):

> According to <u>Strickland</u>, there are two components to an effectiveness inquiry, and the petitioner bears the burden of establishing both ... First, the representation must fall 'below an objective standard of reasonableness.' ... Courts scrutinizing the reasonableness of an attorney's conduct must examine counsel's 'overall performance,' both before and at trial, and must be highly deferential to the attorney's judgments ... In fact, there exists a 'strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."' ... In short, defendant must surmount the presumption that, 'under the circumstances, the challenged action "might be considered sound trial strategy."' ... Thus, the proper inquiry is 'whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' ....

> If the petitioner satisfies the first prong, he must then establish that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result would have been different ....

In support of this MOTION, petitioner avers in his

2

declaration in pertinent part as follows:

3.  On March 1, 1999, I was arrested and charged ... with conspiracy to manufacture methamphetamine.  There were 4 others also charged in this same indictment.

...

5.  After my arrest in March 1999, my family retained a lawyer, Hector Padilla, to represent me.  Mr. Padilla is bilingual in English and Spanish.

6.  Early in the case Mr. Padilla told me that he was not very familiar with federal law so he was going to associate in another lawyer, Mr. Richard Bitters, who is an experienced federal practitioner.  Mr. Bitters does not speak any Spanish.  Mr. Bitters only came to see me about three times, each time Mr. Padilla interpreted the conversation for each of us.

7.  Throughout the entire time my case was pending, it was my understanding that both Mr. Padilla and Mr. Bitters were my attorneys.  However, after I was sentenced, I first learned that Mr. Bitters was actually my attorney of record and that Mr. Padilla never officially entered an appearance as counsel on my behalf.

8.  Sometime in late November, 1999, I hired another lawyer, Mr. William Romaine, to represent me in a civil dispute that I was having with the California Lottery Commission.  In 1989 I won 1 million dollars in the Big Spin and after my arrest, the California Lottery Commission tried to withhold my money.  Mr. Romaine represented me and was successful in getting my 1999 winnings released to one of my family members.  Needless to say, I was very pleased with Mr. Romaine's work.

9.  In early February 2000, although I was aware that Mr. Romaine practices mostly in civil court, I asked him if he would talk to Mr. Padilla and Mr. Bitters to make sure that they were preparing my case, reading the

3

discovery, and were doing everything they could in my case to help me.  I had already spent 1 year in the county jail.  During that one year, many people gave me advice as to what I should do and what I could expect to happen to me.  It was impossible to know who and what to believe.  I asked Mr. Romaine to help me because I did not know who else to ask or who to trust.  I was basically unfamiliar with the criminal justice system here in America.  I was overwhelmed with the charges against me and the potential that I could be sentenced to a life in prison.

10.  Mr. Romaine told me that he met with Mr. Padilla and Mr. Bitters.  I recall that Mr. Romaine told me that he believed there was a huge amount of trial preparation that had not been done, and that he would act as my local counsel and help Mr. Padilla and Mr. Bitters in any way that he could.

11.  During the entire time that Mr. Bitters represented me, I do not recall that he ever explained to me exactly what I was charged with, what evidence the government intended to use against me to try and prove the charges, or the Federal Sentencing Guidelines.  I do recall that spoke [sic] with Mr. Padilla in general terms about the case, and that he showed me some of the government reports.  All of the reports and evidence were in English and I was unable to read or review them on my own.  I do not recall any of my lawyers discussing the specific evidence that the government planned to use or how the information in the document related to the specific charges against me.

12.  I recall that the week before trial started I learned that two of my co-defendants had entered into plea agreements with the government.  On the day before trial, these two co-defendants and two others changed their pleas to guilty.

13.  I recall that about a week before trial, Mr. Romaine told me he spoke with the United States Attorney and that she had mentioned a plea deal for me of 20 years in prison and give up all of the Lottery winnings that I

4

still was owed.  Mr. Romaine did not seem to think that the government's offer to me was a serious one, so we did not spend much time discussing the possibility.

14.  During the week before trial, it was decided that Mr. Romaine would be the trial attorney.  It was my understanding that Mr. Bitters would continued to work on the case and help Mr. Romaine during the trial.  Mr. Romaine assured me that he was prepared for trial even though he did not know until a few days before the trial started that he would be the trial attorney.

15.  At the end of the eighth day of trial, the jury returned guilty verdicts on 10 out of the 22 counts I was charged in.  Co-defendant Chavez was also found guilty.

16.  I was sentenced on July 2, 2001 to a term of Life.

...

18.  During the time that the appeal was being prepared, I was given all of my records from my attorneys.  In these records I found a letter dated August 24, 2000 addressed to both Mr. Bitters and Mr. Romaine from the government offering to settle my case.  I understand that the terms of the offer were that the government would recommend a 20 year sentence and I would forfeit any monies owed to me from the Lottery.  I now also understand that the government specifically stated that they could not promise that the court would accept the terms of the agreement but that they would recommend a twenty year sentence.

19.  Had I known about the specific terms of the plea offer, and been advised of the law, evidence, and possible consequences of rejecting the offer, I would have accepted the offer rather than insisting on going to trial.

20.  One of the charges that I was convicted of is a Continuing Criminal Enterprise.  I now understand that one of the elements the

1    government had to prove was that I was the
     leader, manager, or director of 5 or more
2    persons.  If I had been informed and had
     understood what that government had to prove
3    to convict me, I would have definitely
     accepted the plea offer once I learned that 4
4    of my co-defendants had entered guilty pleas.

5    21.  Although I testified at trial and
     insisted in [sic] my innocence, I still would
6    have entered into a plea agreement had I
     known of the governments [sic] offer and been
7    effectively advised by my attorney that if I
     was convicted at trial I would be sentenced
8    to life.

9    Also submitted in support of petitioner's MOTION is the

10   declaration of William Romaine, wherein he avers in pertinent

11   part:

12   3.  In late 1999, I was retained by Rafael
     Quiroz to represent him on issues arises
13   [sic] out of his receipt of Lottery winnings
     from the State of California.  At that time,
14   Mr. Quiroz was in custody at the Fresno
     County Jail pending trial in United States
15   District Court, Case No. CR-F-99-5060 REC.

16   4.  I was not fluent in Spanish.  Mr. Quiroz
     does not speak English.  I was accompanied by
17   a Spanish speaking interpreter at all of my
     meetings with Mr. Quiroz.  Based on my
18   conversations with Mr. Quiroz, I do not
     believe he has more than 5 years of formal
19   education in Mexico.  Mr. Quiroz is not very
     sophisticated and was totally unfamiliar with
20   the American Criminal Justice System.

21   5.  During one of my meetings with Mr.
     Quiroz, he told me that the attorney fo
22   record in his criminal action was Hector
     Gonzalez Padilla.  He further told me that
23   Mr. Padilla was primarily a state court
     practitioner and associated with another
24   lawyer, Richard Bitters, who was familiar
     with federal law and procedure.

25   6.  I recall that at the time Mr. Quiroz told
26   me that Mr. Padilla would occasionally visit

6

him to discuss the case.  However, Mr. Quiroz told me that Mr. Bitters only met with Mr. Quiroz a few times during the more than 16 months that he represented Mr. Quiroz.

7.  I recall that in early February 2000, Mr. Quiroz asked me to speak with Mr. Padilla to assess the progress of the case and to insure that he (Padilla) was aggressively working on the case.

8.  On February 14, 2000, I sent a letter to Mr. Padilla requesting that we meet to discuss Mr. Quiroz's case.

9.  In late February, I met with Mr. Padilla. I recall that Mr. Padilla was generally familiar with Mr. Quiroz's case, however I opined that there was an enormous amount fo trial preparation, analysis of the evidence, investigation, and legal research that had not been done.  At the conclusion of this meeting, Mr. Padilla asked me if I would act as local counsel on the case.  It was my understanding that Mr. Padilla would continue to act as lead counsel with respect to all matters, including trial preparation and discussions with the government attorney.  I also understood that Mr. Bitters would continue to appear in court, and that I would only assist if there was a specific discreet task that I could execute as local counsel.

10.  After discussing it with Mr. Quiroz, and relating my understanding as to each attorney's role, I agreed to enter a general appearance in Mr. Quiroz' federal criminal case.  On February 28, 2000, I filed a Notice of Appearance ... with the Court Clerk ....

11.  Jury trial in Mr. Quiroz' case was scheduled to commence on August 29, 2000.

12.  As the trial date grew closer, I became more concerned with Mr. Padilla and Mr. Bitters [sic] lack of trial preparation.  As the trial date approached, I was asked to do more and more to assist with the necessary preparation.  I recall that sometime during the week of August 21, it was decided that I would be the trial attorney, with the

7

understanding the [sic] Mr. Padilla and Mr. Bitters would be in attendance to assist me.

13.  During the week before trial, I was aware that Mr. Bitters was having conversations or had at least one conversation with the AUSA on Mr. Quiroz' behalf but I can only remember generally being told that Mr. Bitters had discussed possible plea agreements with the government attorney.  I cannot recall ever being told that a time-limited, specific plea offer had been made to Mr. Quiroz.  During the final week before trial, my role was very focused on preparation for trial and I would not have expected to be involved in such discussions if they were, indeed, going on.

14.  At the time trial commenced or during the week before, I recall having one conversation with the AUSA as to the possibility of resolving the case through a negotiated disposition.  The AUSA did not appear to be serious about resolving the charges against Mr. Quiroz.  I recall that I told Mr. Quiroz about my conversation with the AUSA and what I perceived to be her half-hearted offer to negociate.

15.  I do not recall ever seeing or being aware of a formal plea offer or of a written plea agreement tendered by the government.  I do not recall ever discussing the specific terms of any plea offer with Mr. Quiroz, nor participating in such a discussion.

16.  Sometime within the past year, I have been made aware that there is an August 24, 2000 letter addressed to Mr. Bitters and to myself that memorializes plea discussions that occurred between Mr. Bitters and AUSA Servatius.  Although the letter has Mr. Bitters name and mailing address, it only contains my name with mo mailing address.  The August 24, 2000 letter expressly states that the plea offer is only open for 24 hours.  Since I was unaware of the existence of this written offer, I did not discuss it with my client, Mr. Quiroz.  I did understand, however, that Mr. Bitters was going to discuss plea bargains generally with

Mr. Quiroz and I understood that he had done so outside of my presence.  I did not know, however, what plea bargaining issues Mr. Bitters discussed with Mr. Quiroz nor was I ever Present [sic] when Mr. Bitters discussed any plea bargains offered by the AUSA.

17.  On August 25, two of Mr. Quiroz' co-defendants changed their pleas and entered into signed plea agreements with the government.  On August 28, two more co-defendants changed their pleas and entered into signed plea agreements with the government.  Of the remaining two co-defendants, Raul Chavez went to trial with defendant and Felipe Alvarez was arrested just prior to the August 29 trial date.  Mr. Alvarez eventually did accept a plea offer by the government.

18.  At the conclusion of the jury trial, the jury returned guilty verdicts on the Continuing Criminal Enterprise, Conspiracy to Manufacture Methamphetamine, and 8 substantive Manufacturing counts.  The jury also found that an asset forfeiture was proper in the amount of $4,300,000 ... The jury acquitted Mr. Quiroz of 12 substantive manufacturing counts.

19.  Had I known that the government had made a serious plea offer, I would have taken the time to insure that Mr. Quiroz understood the specifics of the agreement, the evidence against him, the law, and the sentencing consequences of entering a plea versus proceeding to trial.

20.  If I was aware at that time that counsel had not fully explained the Federal Sentencing Guidelines to Mr. Quiroz, I would have taken the time to explain the applicable law to Mr. Quiroz so that he could make an informed, intelligent choice as to whether or not he should proceed to trial.

Submitted as an exhibit to petitioner's MOTION is a copy of a

letter dated August 24, 2000 from AUSA Servatius addressed to Mr.

Bitters at his office in Pasadena and to Mr. Romaine with no

address listed.  There is no indication on the exhibit whether this letter was mailed or faxed to counsel.  The letter states in pertinent part:

> I have previously discussed with Mr. Bitters a proposed resolution of this matter.  As I indicated, should the defendant be convicted at trial, he will face a mandatory 240-year term for the continuing criminal enterprise, and a guideline range of 360 years to life [sic].  Conviction of the conspiracy to manufacture brings a much higher sentence (life) because of the firearms used at the laboratory sites and the hazardous waste released into the environment.  I have agreed to permit Mr. Quiroz to plead to the conspiracy charge with an agreement by the government not to recommend a leadership enhancement or firearm enhancement.  I have explained that I cannot guarantee that probation and the Court will follow this recommendation, but that if they did, the defendant would face a base offense level of 37 and a guideline range of 210 to 262 months.
>
> Enclosed please find the proposed agreement for resolution of this matter as to your client.  The Court has left instructions that such pleas must be entered on Monday, August 28, 2000, and that the plea agreements must be filed with the Court no later than Friday, August 25, 2000.  Please execute the agreement if they [sic] meet with your satisfaction, and return to me early afternoon on Friday.  I will execute them [sic] on behalf of this office and then file them [sic] with the Court.  I will have file-stamped copies available for you at the hearing on Monday.
>
> Should you need to discuss the terms of the plea agreement, please do so as soon as possible. ....

Submitted with the Government's opposition to petitioner's MOTION is the Declaration of Hector Gonzalez Padilla.  Mr.

10

Padilla avers in pertinent part:

> 2.  In early March 1999, I was contacted by family members of Rafael Quiroz.  I was informed that Mr. Quiroz had been arrested and the family wanted to retain an attorney.  I went the Fresno County Jail and met with Mr. Quiroz.  After ascertaining information that Mr. Quiroz was being charged with Federal offenses, I advised him that I didn't have Federal experience and I could only refer him to an attorney with Federal experience ... I introduced attorney Richard H. Bitters to Mr. Quiroz and Mr. Quiroz was satisfied.  However, Mr. Quiroz insisted that I assist Mr. Bitters in his representation.  Mr. Bitters became attorney of record March 22, 1999.

> 3.  Mr. Quiroz was in custody pending federal trial.  I visited him at least once a week as I am fluent in both English and Spanish.  At least twice a month, Mr. Bitters accompanied me when I visited Mr. Quiroz.  Both myself and Mr. Bitters reviewed discovery with Mr. Quiroz.  I translated it to him.  During such conversations, either myself or Mr. Bitters would discuss the case with Mr. Quiroz, including the nature of the charges, possible defenses, trial strategies, and the sentence to which Mr. Quiroz would be exposed if convicted.  Mr. Quiroz denied that he committed the crimes charged against him.  In particular, Mr. Quiroz claimed that the government had confused him with his brother, Robert, and that Roberto [sic] was responsible for these crimes.  Information in discovery indicated that on one occasion Roberto used Mr. Quiroz's identification when identifying himself after winning at a casino.  This was just one such defense which we discussed with Mr. Quiroz.

> In early February 2000, I received a telephone call from William Romaine, advising me that he was representing Mr. Quiroz in a separate matter involving Lotto money that Mr. Quiroz had won but was not receiving.  Mr. Romaine also advised that Mr. Quiroz wanted him to participate in the defense of his case.  I advised Mr. Romaine that I would

1    confirm this information with Mr. Quiroz and
     then discuss the case with him.
2
     5. [sic]  After meeting with Mr. Quiroz, Mr.
3    Quiroz advised me that he wanted Mr. Romaine
     to handle the federal case because he had
4    been successful in recovering the Lotto money
     and because Mr. Romaine had told Mr. Quiroz
5    that he had a 'good chance of beating the
     charges.'  I told Mr. Quiroz that II [sic]
6    disagreed with Mr. Romaine's assessment of
     the case since he had not yet seen the
7    evidence against Mr. Quiroz.  Mr. Quiroz in
     no uncertain terms told myself and Mr.
8    Bitters that he wanted Mr. Romaine to take
     responsibility for the case.  I believe that
9    in late February 2000, Mr. Quiroz and Mr.
     Romaine told Mr. Bitters and myself that Mr.
10   Romaine would continue on the as lead counsel
     [sic] but that he wanted us to remain on the
11   case.  Thereafter, all discovery was provided
     to Mr. Romaine.
12
     6.  Even after Mr. Romaine because [sic] lead
13   counsel on the case, I persistently asked Ms.
     Kathleen Servatius, the assistant U.S.
14   attorney handling the matter, to extend a
     plea offer to Mr. Quiroz.
15
     7.  Throughout Mr. Romaine's representation
16   of Mr. Quiroz, II [sic] constantly asked Mr.
     Quiroz if he was satisfied with Mr. Romaine's
17   work.  Mr. Quiroz assured me that he was
     satisfied on more than one occasion.  He also
18   told me that he wanted Mr. Romaine to conduct
     the trial.  Mr. Romaine assured me that he
19   had tried over 40 federal cases.

20   8.  About one week prior to trial, and due to
     the persistence of Mr. Bitters, the AUSA
21   finally made an offer to Mr. Quiroz.  This
     offer was reduced to writing in the form of a
22   plea agreement and letter explaining the
     terms of the plea and the sentence of Mr.
23   Quiroz would face if he proceeded to trial
     and was convicted.  Mr. Bitters asked me to
24   communicate that offer to Mr. Quiroz.  The
     offer was received the Thursday prior to the
25   trial.

26   9.  I visited Mr. Quiroz and fully explained

                         12

the offer to him.  I advised Mr. Quiroz as to the sentence he would face if convicted under the sentencing guidelines.  Myself and Mr. Bitters had previously discussed the nature of the charges and possible defenses with the defendant.  I strongly advised Mr. Quiroz to take the offer and explained to him that I believed that the government had a strong case against him and that he would be convicted.  Mr. Quiroz' response indicated that he believed that th [sic] was too high, 'I didn't kill anybody.'  I explained to him that the government would not be offering a lower sentence and that he would have to take it or go to trial.  I advised him to take the offer.  Mr. Quiroz advised me that one of the government's witnesses against him, Ernesto Plancarte, was in jail with him and that Plancarte had told Quiroz that he would not testify against him.  I told Mr. Quiroz that it was extremely unlikely that the government brought Mr. Plancarte to Fresno if he was not going to testify.  Mr. Quiroz was convinced that Plancarte would not testify and that without such testimony he could not be convicted.

10.  After speaking with Mr. Quiroz I notified Mr. Romaine of the government's offer and told Mr. Romaine that II [sic] had discussed it with Mr. Quiroz.  II [sic] told him that Mr. Quiroz thought the prison term accompanying the offer was too high, he proclaimed his innocence, and rejected it.

11.  Another hearing was scheduled the day before the trial was to commence.  Mr. Bitters and myself again spoke with Mr. Quiroz regarding the government's plea offer. Mr. Bitters wanted to ensure that Mr. Quiroz understood the offer.  I again directed Mr. Quiroz' attention to the serious consequences of losing the trial.  He indicated that he wished to proceed to trial because Mr. Romaine felt that there was a 'good shot' at being acquitted.

12.  I was present during several days of the trial and consulted with Mr. Romaine concerning a few of the issues that arose during the trial.  Mr. Quiroz was convicted.

13

1
2
3
4
5

> 13.  Mr. Quiroz is Spanish speaking only and
> lacks any formal education.  I believe Mr.
> Romaine was able to convince Mr. Quiroz to
> proceed to trial because Mr. Romaine had been
> successful in obtaining the Lotto money.  I
> strongly believe had Mr. Romaine joined Mr.
> Bitters and myself in encouraging Mr. Quiroz
> to accept the plea offer, Mr. Quiroz would
> have accepted the offer.

6   Also submitted with the Government's opposition is a Declaration

7   of William Romaine, who avers in pertinent part:

8
9
10
11
12

> 2.  I have previously submitted a declaration
> in relation to the defendant' [sic] petition
> to set aside sentence.  My prior declaration
> set forth the facts as I remembered them
> surrounding my role in plea negotiations for
> Mr. Quiroz.  It did not reflect, however, the
> extent of the work which I performed for Mr.
> Quiroz, nor the discussions I had with him
> concerning his case.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

> 3.  I was hired by Mr. Quiroz to assist Mr.
> Bitters and Mr. Padilla in late February
> 2000.  At that time, I pulled the court filed
> and reviewed the complaint, which was very
> detailed and explained the government's case
> against Mr. Quiroz.  I used this information
> to explain to Mr. Quiroz why his case had not
> yet concluded and the federal process.  I
> became more involved as time passed,
> receiving and reviewing discovery provided by
> the government in the case.  I met with Mr.
> Quiroz as many as 15 times, discussing every
> aspect of the case with him.  Between June
> and July 2000, I had extensive discussions
> with Mr. Quiroz specifically regarding the
> nature of the charges against him, the
> elements of the offenses, and the possible
> defenses at trial.  Through the services of
> Spanish language interpreters, some of whom
> were court certified and some of whom were
> not, we discussed my developing trial
> strategy at length during these discussions,
> although there were some limitations imposed
> on this process by the fact that I was not
> fluent in his language and he was not fluent
> in mine.  I ensured that Mr. Quiroz
> understood the charges against him, the law

14

and evidence, and we had several conversations that included my mentioning the potential sentence he might receive if we lost at trial, although I would always express considerable optimism about our chances of prevailing at trial.  I had early on concluded that, based upon the charges against him, Mr. Quiroz faced a level 40 under the sentencing guidelines and the term of imprisonment which would accompany the offense level.

4.  As trial approached, my focus on the defense of the case became increasingly sharpened and my conversations with Mr. Quiroz began to center around what I considered was the government's central evidence against Mr. Quiroz: the testimony of Ernesto Plancarte, and the credibility problems he presented for the government.  An investigator looked into whether we could meet with and interview Mr. Plancarte then in federal custody because I felt that there was a substantial chance that the jury would not believe Plancarte's version of events.  In the few weeks before trial we were first told by the custodial authorities that we could not interview Plancarte, then that he had been transferred to the custody of the Fresno County Sheriff in preparation for his trial testimony.  In any event, we did not get to speak with Mr. Plancarte and I so advised Mr. Quiroz.

5.  Regarding the plea of Mr. Quiroz' co-defendants, I believed that their pleas would result in a stream-lined trial, granted the defendant a de facto severance (which I felt was more favorable to Mr. Quiroz' chances to prevail at trial), and avoid co-counsel or co-defendants' trial strategy to inculpate Mr. Quiroz as a way of exculpating themselves.  In addition, I did not believe that the pleas of Mr. Quiroz' co-defendants would adversely affect Mr. Quiroz as they would not be testifying against Mr. Quiroz as a result of their pleas.  Our conversation with regard to the co-defendants centered upon speculation as to why they would agree to plead guilty.

6.   As I declared previously, I did not participate in plea negotiations with Ms. Servatius regarding Mr. Quiroz' case.  In fact, when I did broach the general topic of whether Mr. Quiroz was interested in exploring a possible plea agreement prior to trial, I felt that Mr. Quiroz was not sufficiently comfortable with our speaking through an interpreter about matters like this that would afford the aura of candor necessary to discuss plea bargaining meaningfully.  I deferred that aspect of the discussion to Mr. Padilla and Mr. Bitters were handling [sic] that aspect of his case because I felt that Mr. Quiroz had a more familiar relationship with Mr. Padilla.  I did not, therefore, regard it as my role to entertain such discussions with Mr. Quiroz and understood him to say that he preferred to have such discussions with Mr. Padilla. Regarding the August plea offer, I did not receive a copy of a plea offer or proposed plea agreement and did not know that any writings of such had been provided by the government.  However, I did learn from Mr. Padilla after that offer was made that an offer had been made by the government.  Mr. Padilla described to me the general terms of the offer (and that it would include forfeiting the Lottery winnings which Mr. Quiroz had won earlier).  Mr. Padilla further advised me that he had communicated the offer to Mr. Quiroz and that Mr. Quiroz had rejected the offer.

7.   After careful reflection, I also recall discussing the fact of the plea offer suggested by Mr. Padilla in general terms (not to advise him as to its terms which had not been provided to me in any detail), but to ascertain that he was still intent of proceeding to trial.  I indicated to him that I was aware he had discussed a plea offer with Mr. Padilla and asked him if he intended to forfeit the Lottery winnings and go to jail for 18 years.  Mr. Quiroz advised me that he wanted to go to trial and that he understood from Plancarte (who was at that time housed with Mr. Quiroz) that Plancarte had assured him he would not testify against him.

16

1    Petitioner contends that he was denied the effective

2    assistance of counsel by Mr. Romaine and Mr. Bitters because of

3    their alleged failure to fully and adequately advise him of the

4    terms of the plea agreement proffered by the Government.

5    Petitioner argues that Mr. Romaine was the attorney had he

6    retained to insure that Mr. Bitters was advising petitioner

7    properly and effectively protecting his interests and that it was

8    incumbent on Mr. Romaine to independently advise petitioner of

9    the law, evidence, and sentencing guidelines as well as to advise

10   petitioner of his professional assessment of the case.  With

11   regard to Mr. Bitters, petitioner asserts that Mr. Bitters

12   presented him with only the general concept of the plea offer and

13   that petitioner does not recall that petitioner was shown a

14   written offer or that the written plea offer was ever translated

15   into Spanish for him to review.

16    It is clear from the record before the court, including

17   petitioner's declaration, that petitioner was aware of the

18   general terms of the plea offer.  Furthermore, petitioner has not

19   disputed the averments in Mr. Padilla's declaration that Mr.

20   Padilla met with petitioner after the written plea offer was

21   provided and went over it in detail with petitioner and that

22   petitioner advised Mr. Padilla that he did not want to accept the

23   plea offer.  Mr. Padilla's undisputed declaration is corroborated

24   by the declarations of Mr. Romaine.  Petitioner's implication

25   that he was denied the effective assistance of counsel because

26   Mr. Romaine did not also review the written plea agreement with

him is without merit given petitioner's apparent concession that
Mr. Padilla did so and given his admission that he was aware of
the general terms of the written plea offer.

Furthermore, petitioner has not established the prejudice
prong for his claim of ineffective assistance of counsel.
Although petitioner now avers that he would have accepted the
plea offer, it is clear from the record above that petitioner was
made aware of the terms of the proposed plea agreement and still
decided to go to trial.  Petitioner has not disputed the
averments in Mr. Padilla's declaration or the averments in Mr.
Romaine's second declaration to this effect.  It is noted that
petitioner, given his admission that he was aware of the general
terms of the plea offer, took the stand in his own defense and
testified to his innocence.

Petitioner generally contends that Mr. Bitters and Mr.
Romaine were not prepared for trial, thereby depriving petitioner
of the effective assistance of counsel.  In so asserting,
petitioner refers the court to the transcript of proceedings on
August 28 and August 29, 2000.  On August 28, 2000, the following
occurred:

> MR. ROMAINE: In addition, your Honor, we are
> prepared to commence trial tomorrow morning,
> as scheduled, with a very serious concern
> that we've had, your Honor.  About the middle
> of last week, we received about 600 pages of
> discovery from the U.S. Attorney's Office.
> And in reviewing that, it appears that there
> are a number of serious violations of both
> Brady versus Maryland and Rule 16, among
> other things, your Honor.

18

1    The U.S. Attorney apparently has held since
     December of last year an expert witness
2    document relating to handwriting that is
     exculpatory under Brady, in part, and is also
3    - contains decision of expert witness.  We
     have at the beginning of this case wanted
4    that discovery provided to us.  It was not
     provided to us until this last week.  Mr.
5    Quiroz has been in custody in this matter, as
     I pointed out in May since March of 1999.
6    His speedy trial rights have really dragged
     out.
7
     This violation of discovery places a very
8    serious burden on us.  It's made it - I
     certainly had some motions in limine with
9    regard to that, I would have them prepared if
     I had the time for today.  And in addition to
10   that, it's going to make it more difficult
     for us to prepare the jury instructions
11   because of it.  However, we do not want to
     push Mr. Quiroz's trial date back any
12   further.  He's been in custody for a very
     long time.
13
     With these considerations, your Honor, I'd be
14   prepared tomorrow morning to go to trial and
     ask that the Court give me some indulgence
15   with regard to the jury instructions and the
     MOTION in limine.
16
     THE COURT: Ms. Servatius?
17
     MS. SERVATIUS: Your Honor, the report that
18   described the conclusions of the expert had
     been provided.  Mr. Meters had created that
19   report.  The expert qualifications were
     provided in all the documents that he
20   examined.  Basically, he looked at Western
     Union wire transfers and tried to determine
21   whether or not he could say whether or not
     Mr. Quiroz was the individual who signed the
22   backs of them, and his conclusions are set
     forth.  Some of them - I don't see what that
23   has to do with the jury instructions in the
     case.  But I can work with Mr. Romaine if
24   he's concerned that he doesn't understand the
     nature of what he's been provided.
25
     MR. ROMAINE: I understand the nature, your
26   Honor, they were provided last week.

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

THE COURT: Well, Mr. Romaine, you presented nothing to the Court. The Court has nothing it can rule on. You've advised that you do not want to take the benefit of a continuance as a result of the indictment being amended. I don't have anything to rule on. You've told me you'd like to file some motions in limine and you'd like to have done something else. I don't have anything that I can do anything about.

MR. ROMAINE: I'm only asking the Court for indulgence to file motions in limine tomorrow morning.

THE COURT: I can't make any ruling on that because I don't know any reason why such MOTION should be late filed.

MR. ROMAINE: Other than the fact that we only received the discovery that is the substance of that last week, that's our concern, your Honor. That would be what I presented to the Court. I'm sorry I couldn't present something more formal, but, again, because - it's certainly not because of us, we've had months and months and months to have this information, which we haven't received. Because of that, we're put in an extreme bind that I can't really present the Court with something substantive to rule on.

THE COURT: Then the Court can't make any rulings. I don't know how you can expect me to make rulings to allow motions in limine in a case that's going to start in the morning or anything on jury instructions, so I have nothing to rule on so I can't make any ruling.

MR. ROMAINE: I'll attempt to file something today for the Court to look at, but I don't know if I can do that given the elapsed time, we are concerned about that.

On August 29, 2000, the following transpired:

MR. ROMAINE: ... If the court please, very briefly, as a continuation of what I mentioned yesterday, after the appearance yesterday I met with the U.S. Attorney and

20

1   learned, among other things, that there were
    about seven boxes of bank records that we
2   have not been provided.

3   After concurring with co-counsel on that as
    well as the other issues that I raised of
4   concern, and I had not spoken with Mr. Quiroz
    yet, but, your Honor, it appears for the
5   record in fairness that with that kind of
    late discovery a Rule 16 problem, as much as
6   I do not want Mr. Quiroz to continue to stay
    in custody waiting for trial, I don't know
7   that it would be fair to be able to prepare
    this matter for Mr. Quiroz' defense with the
8   discovery of seven boxes of banking records
    the eve before trial when apparently the U.S.
9   Attorney had these documents for a very long
    time.
10
    As I indicated yesterday, there is also the
11  handwriting issue that they had since
    December of last year that we just got last
12  week, 604 pages.  It seriously compromises
    Mr. Quiroz' defense.
13
    THE COURT: You brought this up yesterday.
14  You weren't specific about anything.  You
    just said you had some materials.  there is
15  nothing specific about what you want to do.
    You had the opportunity yesterday on the
16  superseding indictment to have a continuance.
    You didn't ask for it.  You waived that
17  right.  The jury has been called.

18  Miss Servatius, has this been discovery that
    should have been provided before that is now
19  being provided?

20  MS. SERVATIUS: Your Honor, the information
    that is contained in the records was
21  something that was available to counsel.  I
    don't intend to introduce the seven boxes.
22  It was from the investigation that was
    conducted in 1993 through 1995 by the San
23  Jose Police Department.  I spoke with Mr.
    Romaine about these and indicated that if he
24  had financial information of interest to his
    client that he wanted to introduce, that we
25  would make the records available.

26  THE COURT: When was Mr. Romaine told about

21

1          these records, that he could review them?

2          MS. SERVATIUS: Your Honor, they are in the
           report.  The description of Agent Bernell's
3          (phonetic spelling) investigation, these
           documents are in the report, so the
4          description of bank records, these have been
           available to the defense if they wanted them,
5          and I spoke to Mr. Bitters about this a
           couple of weeks ago and indicated to him that
6          I didn't plan on using those documents but
           that if he wanted to see them, we would make
7          them available to him because they were in
           San Jose.  He just had to let me know.

8
           MR. ROMAINE: Your Honor, I am not aware, and
9          certainly Mr. Bitters is not here to
           contradict that.
10
           THE COURT: The point is: Are they listed in
11         documents that have been given to you
           previously in discovery?
12
           MR. ROMAINE: Your Honor, I have not seen
13         these bank records listed.

14         THE COURT: I didn't ask you that, Mr.
           Romaine.  I said is there a list that you can
15         refer to that you could get them at any time
           you wanted them?
16
           MR. ROMAINE: No, not to my knowledge, except
17         for yesterday afternoon when I spoke with –

18         THE COURT: They are not in any of the
           documents that you have been furnished in
19         discovery, they are not referred to?

20         MR. ROMAINE: I could not answer that in
           fairness, your Honor.
21
Petitioner contends that these colloquies establish that Mr.
22
Romaine was not familiar with all of the evidence and had not
23
reviewed it and that "[i]t shocks the conscience that one week
24
before trial is to commence an attorney would agree to be lead
25
counsel without reviewing and analyzing all of the discovery
26
                                22

1   produced by the government, researching and analyzing the law,

2   and discussing his insights and opinions with the client."

3   Petitioner further contends that the failure of Mr. Bitters to

4   review the bank records in the seven boxes constitutes

5   ineffective assistance of counsel because Mr. Bitters "could not

6   have given defendant [sic] the benefit of his professional advice

7   based on his knowledge of the evidence in the case."

8       The court concludes that petitioner has not demonstrated

9   ineffective assistance of counsel on this ground.  Petitioner

10  makes no showing that the failure of defense counsel to review

11  the evidence referred to by Mr. Romaine, apparently belatedly

12  provided by the Government, prejudiced petitioner.  There is no

13  showing that any of this evidence would have been relevant and

14  material to petitioner's defense.  This is particularly true with

15  the bank records from the San Jose investigation since the

16  Government did not introduce any of that evidence at trial.

17  Petitioner makes no showing that defense counsel was unable to

18  review this evidence during the trial itself or that petitioner

19  was prejudiced by defense counsel's failure to request a

20  continuance because of this evidence after the United States had

21  presented its case in chief.

22      ACCORDINGLY:

23      1.  Petitioner Rafael Montejano Quiroz's MOTION to vacate,

24  set aside or correct sentence pursuant to 28 U.S.C. § 2255 is

25  denied.

26      2.  The Clerk of the Court is directed to enter judgment for

23

1  respondent.

2  IT IS SO ORDERED.

3  **Dated:  May 25, 2005**                    **/s/ Robert E. Coyle**

4  668554                            UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26