1
2
3
4
5
6
7

8               UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No.  1:99-cr-05060-ADA-1

12              Plaintiff,                   ORDER GRANTING DEFENDANT RAFAEL
                                            QUIROZ'S MOTION FOR REDUCTION OF
13        v.                                SENTENCE PURSUANT TO 18 U.S.C. §
                                            3582(c)(2)
14   RAFAEL QUIROZ,
                                            (ECF No. 474)
15              Defendant.

16

17        On February 25, 2021, Defendant Rafael Quiroz ("Defendant") filed a *pro se* motion for a

18   reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  (ECF No. 474.)  Defendant is

19   currently serving his life sentence at United States Penitentiary Atwater ("USP Atwater"), and to

20   date, he has served approximately 23 years of his life sentence.  The motion is based in part on the

21   effect of the COVID-19, coronavirus pandemic on conditions of confinement.  (*Id.* at 1.)  For the

22   reasons explained below, the Court grants Defendant's motion for compassionate release.

23                              **BACKGROUND**

24        On September 8, 2000, Defendant Quiroz was found guilty following a jury trial to one

25   count of continuing criminal enterprise in violation of 21 U.S.C. § 841(a)(1), conspiracy to

26   manufacture, distribute, and possess with intent to distribute methamphetamine in violation of 21

27   U.S.C. §§ 846, 841(a)(1), and nine counts of manufacturing methamphetamine and aiding and

28   abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  (ECF Nos. 187, 188.)  Defendant

worked as a leader of a methamphetamine manufacturing conspiracy for a period of several years. (ECF No. 488 at 2.)   Investigations in 1994 and 1995 tied Defendant to seizures of cash, methamphetamine, and precursor chemicals used in the production of methamphetamine.   (*Id.* at 2.)   From the four methamphetamine laboratories underlying Count 1, law enforcement seized a total of 137 kilograms of methamphetamine.   (*Id.*)   Judgment was entered on July 5, 2001.   (ECF No. 284.)   The then-assigned District Judge sentenced Defendant to life imprisonment, followed by a 60-month term of supervised release, $4,000,000 fine, and $900 special assessment.   (ECF Nos. 279, 284.)   Defendant timely filed a notice of appeal on issues of sufficiency of evidence and on the issue of failure to declare mistrial following government's alleged vouching for a witness. (ECF No. 285.)   The Ninth Circuit Court of Appeals denied his appeal, and his conviction became final following the Supreme Court's denial of writ of certiorari.   *Quiroz v. United States*, 540 U.S. 850, 124 S.Ct. 130 (Mem) (2003).

Defendant is currently serving his life sentence at USP Atwater.   *Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited September 8, 2023). On February 25, 2021, Defendant filed *pro se* the pending motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).   (ECF No. 474.)[1]   The Court referred the motion to the Federal Defender's Office ("FDO"), and the FDO submitted a supplemental memorandum in support of compassionate release on May 10, 2021.   (ECF Nos. 475, 478.)   On June 23, 2021, the government filed its opposition to the motion, and on July 8, 2021, Defendant filed his reply thereto. (ECF Nos. 488, 489.)   On September 23, 2022, Defendant filed a memorandum of supplemental

---

[1] Defendant has also previously filed two motions to vacate or set aside sentence under 28 U.S.C. § 2255.  Defendant timely filed his first petition pursuant to 28 U.S.C. § 2255 on October 5, 2004 (hereinafter, Defendant's "first 2255 motion").  (ECF No. 305.)  The primary claim raised in Defendant's first 2255 motion was a claim for ineffective assistance of counsel based on the failure of counsel to adequately represent the government's offer of plea agreement to Defendant causing Defendant to reject the offer and stand trial resulting in a harsher sentence.  Defendant's first 2255 Motion was denied on May 26, 2005.  (ECF No. 388.)  A certificate of appealability was denied. On February 28, 2013, the Ninth Circuit Court of Appeals issued an order granting Defendant's request to file a second or successive petition pursuant to 28 U.S.C. § 2255.  (ECF No. 412.) Defendant filed his second petition pursuant to 28 U.S.C. § 2255 on March 6, 2013.  (ECF No. 413.)  Defendant raised an ineffective assistance of counsel claim that alleged the same factual background as Defendant's first 2255 Motion.  (*Id.*)  Defendant's second 2255 motion was denied on August 28, 2015.  (ECF No. 439.)

authorities, citing to Supreme Court and Ninth Circuit precedent that impacts his case.  (ECF No. 516.)

## LEGAL STANDARD

A court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances.").  Those limited circumstances include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp. 3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018 ("FSA"), motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A) (2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the FSA specifically provides that a court may:

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that
>
> (i)   extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)  the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the

---

[2]  If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a).  If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.*  "Appeal to the General Counsel is the final administrative appeal." *Id.*  When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

1    community, as provided under section 3142(g);

2        and that such a reduction is consistent with applicable policy
     statements issued by the Sentencing Commission[.]

3

4    18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

5        The applicable policy statement with respect to compassionate release in the U.S.

6    Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

7    compelling reasons."   U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 1B1.13 (U.S. Sent'g

8    Comm'n 2018)[4]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020)

9    (noting that many courts have relied on U.S.S.G. § 1B1.13 to define "extraordinary and compelling

10   _____

11   [3]  Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home
     confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6

12   months."   The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L.
     116-136, expands the BOP's authority to release incarcerated defendants without judicial

13   intervention.  The CARES Act allows the BOP to "lengthen the maximum amount of time" for
     which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director

14   determines appropriate," assuming "the Attorney General finds that emergency conditions will
     materially affect the functioning" of the BOP.  CARES Act, Pub. L. 116-136, Div. B, Title II,

15   § 12003(b)(2) (2020).  However, the BOP's authority in this regard is limited to "the covered
     emergency period."  *Id.*  The BOP's authority expires "30 days after the date on which the national

16   emergency declaration terminates."  *Id.* § 12003(a)(2).  After the CARES Act was enacted, the
     Attorney General issued a memo instructing the BOP to "immediately review all inmates who have

17   COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is
     materially affecting operations."  Office of Att'y Gen., *Increasing Use of Home Confinement at*

18   *Institutions Most Affected by COVID-19* (Apr. 3, 2020).  The BOP has acted on the Attorney
     General's guidance, including one case in which a sentenced prisoner was released to home

19   confinement after serving less than half his sentence from a facility that reported no positive
     COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort Seeks Prison*

20   *Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.
     com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the

21   prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release
     prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid*

22   *COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-
     manafort-released-from-prison-amid-covid-19-fears.

23

24   [4]  According to U.S.S.G. § 1B1.13(2), to be granted a reduction of sentence under 18 U.S.C.
     § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the

25   community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).  However, as the Ninth
     Circuit has now clarified, "[t]his dangerousness finding is not statutorily required under 18 U.S.C.

26   § 3582(c)(1)(A)(i), but [it] is part of the Sentencing Commission's policy statement in U.S.S.G.
     § 1B1.13(2)."  *United States v. Aruda*, 993 F.3d 797, 799 (9th Cir. 2021).

27

28

reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, the Ninth Circuit has now held "that the current version of U.S.S.G. § 1B1.13 is not an 'applicable policy statement[ ]' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant." *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021). "In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to § 3582(c)(1)(A) motions filed by a defendant." *Id.* The Ninth Circuit clarified that "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.* (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)).

In so holding, the Ninth Circuit joined the five other circuits who have addressed this issue and have unanimously held "that U.S.S.G. § 1B1.13 only applies to § 3582(c)(1)(A) motions filed by the BOP Director and does not apply to § 3582(c)(1)(A) motions filed by a defendant." *Id.*; *see, e.g.*, *United States v. Brooker (Zullo)*, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020) ("In cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13."); *Gunn*, 980 F.3d at 1181 ("[T]he Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release. District judges must operate under the statutory criteria—'extraordinary and compelling reasons'—subject to deferential appellate review."); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) ("In short, we agree with the Second Circuit and the emerging consensus in the district courts: There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'") (citation omitted); *United States v. Maumau*, 993

5

F.3d 821, 837 (10th Cir. 2021) ("We therefore agree with the district court that under the second part of § 3582(c)(1)(A)'s test, its finding that extraordinary and compelling reasons warranted a reduction in Maumau's case was not constrained by the Sentencing Commission's existing policy statement, U.S.S.G. § 1B1.13.").

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998). District courts that have considered such motions agree that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020).

## ANALYSIS

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id*. Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id*.

*United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *see also United States v. Ramirez-Suarez*, No. 16-cr-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *United States v. Parker*, 461 F. Supp. 3d 966, 970 (C.D. Cal. 2020); *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(C)(1)(A) release must be "consistent with" the sentencing factors set forth in § 3553(a)).

### A. Administrative Exhaustion

In this case, the government concedes that Defendant has exhausted his administrative remedies prior to filing his pending § 3582 motion. (ECF No. 488 at 4.) On December 28, 2020,

6

Defendant submitted a request for compassionate release and reduction in sentence due to COVID-19 to his Warden.  (ECF No. 474 at 12.)  The request is still pending.  (ECF No. 488 at 4.)  Accordingly, the Court finds that Defendant has exhausted his administrative remedies and will turn to the merits of Defendant's motion.

## B. Extraordinary and Compelling Reasons

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)-(D).  As addressed above, even though the catch-all "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, courts have agreed that defendants may rely upon it when bringing their own motions for reductions in their sentence under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3-4 (E.D. Cal. Apr. 28, 2020) (collecting cases.)  Moreover, in light of the Ninth Circuit's decision in *Aruda*, while U.S.S.G. § 1B1.13 may inform its determination, this Court is not restricted thereby and instead has "full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13."  *Jones*, 980 F.3d at 1111.

### 1. Medical Conditions Warranting Compassionate Release

A defendant's medical condition may warrant the granting of compassionate release where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1(A)(i).  Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia."  *Id*.  In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

> The defendant is
>
> (I)     suffering from a serious physical or medical condition,
>
> (II)    suffering from a serious functional or cognitive impairment,

1    or

2          (III)   *experiencing deteriorating physical or mental health because*
           *of the aging process, that substantially diminishes the ability*
3          *of the defendant to provide self-care within the environment*
           *of a correctional facility and from which he or she is not*
4          *expected to recover.*

5    *Id*. at cmt. n.1(A)(ii) (emphasis added).  Where a defendant has moderate medical issues that

6    otherwise might not be sufficient to warrant compassionate release under ordinary circumstances,

7    many courts have concluded that the risks posed by the ongoing COVID-19 pandemic may tip the

8    scale in favor of release when the particular circumstances of a case are considered in their totality.

9    *See, e.g.*, *Parker*, 461 F. Supp. 3d at 980 ("Since the onset of the COVID-19 pandemic, courts have

10   determined that inmates suffering from conditions such as hypertension and diabetes are now at an

11   even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances

12   that may justify compassionate release.") (collecting cases); *United States v. Rodriguez*, 451 F.

13   Supp. 3d 392, 405 (E.D. Pa. 2020) ("Without the COVID-19 pandemic—an undeniably

14   extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and

15   rehabilitation would not present extraordinary and compelling reasons to reduce his sentence.  But

16   taken together, they warrant reducing his sentence.").

17         In the pending motion, Defendant argues that his medical condition and the risks posed to

18   him by COVID-19 constitute extraordinary and compelling reasons to warrant his compassionate

19   release.  Specifically, Defendant argues that the crowded condition of USP Atwater increases the

20   risk of contracting COVID-19.  (ECF No. 474 at 1.)  Defendant states he tested positive for the

21   virus on December 15, 2020, explaining that it "nearly killed him" and that he is now recovering.

22   (*Id.*)  Defendant asserts that due to his genotype, he is three times more likely to contract COVID-

23   19.  (*Id.* at 2.)  Defendant is a 59-year-old Hispanic male, and has a BMI of over 30, which suggests

24   that he is obese. (ECF No. 474 at 9.)  As of December 28, 2022, in comparison to non-Hispanic

25   whites, Hispanic or Latino persons are 1.5 times more likely to contract COVID-19, 1.9 times more

26   likely to be hospitalized due to COVID-19, and 1.7 times more likely to die due to COVID-19.[5]

27   ───────────────

28   [5] Defense counsel cites to the 2021 version, which indicated higher rates: Hispanic or Latino
     persons are 2.0 times more likely to contract COVID-19, 3.0 times more likely to be hospitalized

Defendant further notes that COVID-19 vaccines are not as effective for people with obesity than non-obese individuals.[6]  Defendant received two doses of the PfizerBioNTech COVID-19 vaccine, receiving the second dose in mid-February 2021.  (ECF No. 478 at 10.)  Citing to several articles, Defendant argues that despite receiving the vaccine, he is still at risk of getting infected.  (*Id.* at 11.)  Defendant further notes that he suffers from dizziness and nausea.  (ECF No. 478 at 8.)  In March of 2021, Defendant was diagnosed with aural vertigo, which is a disorder of vestibular function with symptoms of dizziness and vertigo.  (*Id.*)

Defendant also cites to several court decisions that have released similarly situated defendants who have been vaccinated, based on COVID-19 breakthrough infections.  (*Id.*)  Of those decisions, the most recent case is *United States v. Sweet*, No. 07-20369, 2021 WL 1430836 (E.D. Mich. Apr. 15, 2021).  The Sixth Circuit subsequently reversed the district court decision, holding that the district court abused its discretion when it determined that the defendant had demonstrated extraordinary and compelling reasons meriting his release.  *United States v. Sweet*, No. 21-1477, 2021 WL 5371402, at *3 (6th Cir. Nov. 18, 2021).  The court reasoned that the defendant did not demonstrate an extraordinary or compelling reason because he largely faces the same risk from COVID-19 as non-incarcerated, vaccinated individuals.  *Id.*  The court further noted that aside from pointing to the prison's congregate setting, the district court offered no other reason why the defendant's risk of reinfection would be any greater in confinement than it would be in the outside world.  *Id.*  Therefore, *Sweet* runs against Defendant's argument of release based on COVID-19-related reasons.

In opposition, the government argues that the mere existence of COVID-19 in society and

from COVID-19, and 2.3 times more likely to die from COVID-19.  The lower likelihood of hospitalization and death, in comparison to rates from 2021 to now, cuts against Defendant's argument that COVID-19 presents an extraordinary and compelling reason for his release.  *See* CDC, *Risk for Covid-19 Infection, Hospitalization, and Death By Race/Ethnicity* (Dec. 28, 2022), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

[6] *See* Sarah Varney, *America's Obesity Epidemic Threatens Effectiveness of Any COVID Vaccine*, KAISER HEALTH NEWS (Aug. 6, 2020), https://khn.org/news/americas-obesity-epidemic-threatens-effectiveness-of-any-covid-vaccine/.

1  the possibility that it may spread to a particular prison alone cannot independently justify

2  compassionate release.  (ECF No. 488 at 7.)  The government contends that section 3582(c)(1)(A)

3  "contemplates sentence reductions for specific individuals, not the widespread prophylactic release

4  of inmates and the modification of lawfully imposed sentences to deal with a viral pandemic."  (*Id.*)

5  The government notes that Defendant had already contracted and recovered from COVID-19

6  without symptoms or apparent complications.  (ECF No. 483 at 8, 14, 14-15, 27.)  The government

7  argues that because Defendant is fully vaccinated against COVID-19, he does not present an

8  "extraordinary or compelling" reason, citing to several cases finding that defendants who have been

9  vaccinated do not present extraordinary or compelling reasons for release.  (ECF No. 488 at 8.)

10      Here, the Court finds that Defendant failed to carry his burden to demonstrate that he is

11  currently "substantially diminishe[d]" in his ability to "provide self-care" at USP Atwater.  *See*

12  U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii); *Greenhut*, 2020 WL 509385, at *1 ("The defendant bears the

13  initial burden to put forward evidence that establishes an entitlement to a sentence reduction.").

14  "Although no federal court of appeal appears to have considered the question, district courts across

15  the country, including within this Circuit, have held almost uniformly that a defendant's vaccination

16  undercuts any claims of 'extraordinary and compelling reasons' based on a high risk of infection."

17  *United States v. Smith*, 538 F.Supp.3d 990, 996 (E.D. Cal. May 11, 2021); *see United States v.*

18  *Grummer*, 519 F. Supp. 3d 760, 763 (S.D. Cal. Feb. 16, 2021) ("Although Defendant suffers from

19  several chronic medical conditions, his vaccination significantly mitigates the risk that he will

20  contract COVID-19.").[7]  As of the date of this order, there are currently no inmates or staff members

---

[7] According to the CDC, authorized vaccines "are highly effective at protecting vaccinated people against symptomatic and severe COVID-19." *COVID-19: Interim Public Health Recommendations for Fully Vaccinated People, Centers for Disease Control and Prevention*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last updated May 28, 2021) (emphasis added).  Medical evidence strongly suggests that fully vaccinated individuals are very well protected against becoming severely ill from COVID-19.  *See United States v. Ochoa-Alapisco*, No. 14-cr-378-ADM-LIB-2, 2021 WL 2322680, at *3 (D. Minn. June 7, 2021) (denying compassionate release because "any risk . . . has been substantially reduced because [defendant] is likely now fully vaccinated" which "provides him with significant protection against severe illness or death from COVID-19 should he become reinfected"); *United States v. Willis*, No. 3:15-cr-00465-BR, 2021 WL 2179256, *3-4 (D. Or. May 27, 2021) (concluding that federal prisoners who have been fully vaccinated but suffer from chronic medical conditions that would put them at serious risk of severe illness from COVID-19 do not satisfy the extraordinary and

who are reported as positive for the COVID-19 virus at USP Atwater.[8]  Because it appears that current active cases among prisoners at USP Atwater have been reduced to zero, COVID-19 does not tip the scales in favor of Defendant's compassionate release at all.  Furthermore, nothing currently in the record before this Court establishes that Defendant is currently struggling to take care of himself.

Therefore, the Court does not find COVID-19 as an extraordinary and compelling reason to justify Defendant's compassionate release pursuant to § 3582(c)(1)(A).

## 2. Extraordinary and Compelling "Other" Reason Warranting Compassionate Release

In the supplemental brief, Defendant argues that he would have not received a life sentence for a methamphetamine-related offense, with no allegations of violence, if he were sentenced today. (ECF No. 478 at 6.)  In 2001, Defendant was sentenced when the Sentencing Guidelines were mandatory.  In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court declared the Sentencing Guidelines as advisory.  *Id.* at 266.  Because of *Booker*, the Court has the discretion to vary below a life term for Defendant and similarly situated defendants.  (ECF No. 478 at 6.) Defendant presents that today, judges vary below the guidelines on average of 31.3% in methamphetamine trafficking cases.[9]  Defendant suggests that a life offense is 470 months, and a

---

compelling standard for compassionate release) (citing cases); *United States v. Kariblghossian*, No. 2:13-cr-00318-CAS-1, 2021 WL 1200181, at *3 (C.D. Cal. Mar. 29, 2021) (finding no extraordinary and compelling reasons for compassionate release where defendant has been fully vaccinated); *United States v. Ballenger*, No. 3:16-cr-5535-BHS, 2021 WL 308814, at *5 (W.D. Wash. Jan. 29, 2021) ("[B]ecause [defendant] has already been infected and vaccinated, his chronic medical conditions alone do not amount to an extraordinary and compelling reason to warrant compassionate release.").  Finally, as one judge of this court emphasized recently, "[i]f defendants could buttress their motion for compassionate release by refusing a safe and effective vaccine, they would be operating on an unfairly perverse incentive."  *United States v. Figueroa*, No. 2:09-cr-00194-KJM, 2021 WL 1122590, at *4 (E.D. Cal. Mar 24, 2021).

[8] While the undersigned does not necessarily accept these reported numbers at face value in light of the CDC guidelines with respect to both testing and the manner of counting "active cases," there is also no evidence before the Court challenging those reported numbers in this case.  *See* Federal Bureau of Prisons, Covid-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited February 10, 2023).
[9] *See* USSC, *Quick Facts re Methamphetamine Trafficking*, at 2 (2013), Available at: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/quick_facts_methamphetamine_2013.pdf (last accessed by defense counsel on May 9, 2021). The Court cites to an updated version for 2020, which indicates that of the 34.0% of

1  reduction of 31.3% would suggest a sentence of 323 months or 27 years.  (ECF No. 478 at 7.)  If

2  Defendant received good conduct credits, Defendant argues that his more than 22 years in prison

3  nearly reaches the amount he would have received.  (*Id.*)

4        As summarized above, in 2000, Defendant was convicted of several serious drug trafficking

5  offenses, including the manufacturing of approximately 137 kilograms of methamphetamine over

6  the course of several years that he operated his criminal enterprise.  (Presentence Report ("PSR")

7  at 5-11.)  The presentence report determined that Defendant's prior criminal history and instant

8  offenses committed during probation placed him in category II and that his total offense level was

9  44,[10] therefore calling for a life term of imprisonment under the mandatory sentencing guidelines

10  in effect in 2000.  (PSR at 16-17.)  Specifically, the presentence report stated as follows:

> The guideline range in this case is Life imprisonment.  Although the defendant
> has only sustained one prior criminal conviction over the course of his adult life,
> there are no mitigating circumstances with respect to his efforts to manufacture
> and distribute massive quantities of methamphetamine.  In light of the
> circumstances relating to this case, it appears a sentence of Life imprisonment is
> appropriate.  Therefore, it is recommended the defendant be committed to the
> Bureau of Prisons for Life.  Such a sentence is viewed as suitable punishment for
> the offense, holding the defendant accountable for his actions, and depriving him
> of the ability to engage in future criminal behavior.

16  (PSR at 21.)

17        On September 23, 2022, Defendant filed a supplemental memorandum with new legal

18  authority concerning the instant matter, most notably, *United States v. Favela*, No. 1:94-cr-05044-

19  DAD-1, 2022 WL 4450496 (E.D. Cal. Sept. 23, 2022).  In *Favela*, the defendant urged the court to

20  find that "other reasons" warrant his compassionate release.  *Id.* at *10.  Specifically, based on the

---

methamphetamine trafficking offenders who received a variance from the Sentencing Guidelines
range, 98.4% received a downward variance with an average sentence reduction of 34.2%.  *See*
USSC, *Quick Facts re Methamphetamine Trafficking*, at 2 (2020), Available at:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-
facts/Methamphetamine_FY20.pdf (last accessed by the Court on February 2, 2023).

[10] "In the rare cases, a total offense level of less than 1 or more than 43 may result from application
of the guidelines.  A total offense level of less than 1 is to be treated as an offense level of 1.  An
offense level of more than 43 is to be treated as an offense level of 43."  *Annotated 2021 Chapter
5, Chapter Five – Determining the Sentence*, UNITED STATES SENTENCING COMMISSION,
https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-5 (last visited
Feb. 7, 2023).  Here, the Court may consider Defendant's criminal offense level of 44 as 43 for
purposes of this order.

fact that if he were sentenced today, in a post-*Booker* advisory guideline landscape, the defendant's sentence "would be lower for the simple reasons that an offense such as his—one involving only methamphetamine, with no allegations of violence, for a first-time offender without any criminal history—would not be punished with a life term," and that "post-*Booker*, this Court would have the discretion to vary below a life term." *Id.* at *10.

The *Favela* court applied the rationale of *United States v. Parker*, 461 F. Supp. 3d 966 (C.D. Cal. 2020), where the court recognized its authority under 18 U.S.C. § 3582(c)(2) to modify the defendant's sentence after considering the advisory nature of the guidelines after *Booker*. *See Parker*, 461 F. Supp. 3d at 981. The court consequently found that the "[defendant] was sentenced to life imprisonment solely because the sentencing guidelines were considered mandatory in 1995; the sentencing court had no discretion to impose any other sentence absent a recognized ground for departure." *Favela*, 2022 WL 4450496, at *11. The defendant was currently serving life in prison, pursuant to a judgment rendered under a sentencing regime that is no longer in effect and has since been declared unconstitutional. *Id.* The court acknowledged that the Sentencing Guideline range applicable to the defendant has not been altered by the Supreme Court's *Booker* decision, meaning the defendant's applicable advisory sentencing guideline range would still be "life." Nonetheless, the court found that a life sentence is no longer mandatory. *Id.* (citing *United States v. Booker*, 543 U.S. 220 (2005)).

The *Favela* court had many years of experience sentencing defendants in the heavily impacted Eastern District of California, which carries some of the heaviest criminal caseloads in the country, but the court has never imposed a sentence as long as a life sentence imposed on the defendant. *Id.* The court would have not sentenced the defendant for life if he were to be sentenced today under contemporary standards. *Id.* The court noted that the total offense level of 42, which is one notch below the defendant's level of 43, calls for a guideline range of "360 months to life," and the defendant had already served a term of 387.1 months, which is the low end of the guideline range. *Id.* The court found that the defendant had satisfied his burden of demonstrating "other reasons" that established the extraordinary or compelling circumstances warranting a reduction in his life sentence. *Id.*

Here, the Court similarly finds that Defendant presents an "other reason" warranting compassionate release under Section 3582(c)(1)(A).  The Court acknowledges, however, that Defendant has only served around 265 months[11] of his sentence, which is below the sentencing guidelines, unlike *Favela* who had already served more than the lower end of the guideline range.  Furthermore, Defendant had one prior criminal conviction.  On the other hand, like *Favela*, Defendant was convicted of methamphetamine-related charges with no allegations of violence and had been sentenced for a life imprisonment term during the pre-*Booker* era.  Like *Favela*, if Defendant were sentenced today, he would likely not have received a life sentence.  Therefore, Defendant has successfully carried the burden to present an extraordinary and compelling "other" reason that warrants his compassionate release.

**C. Consistency with the § 3553(a) Factors**

Because Defendant has demonstrated an extraordinary and compelling reason for compassionate release, the Court must determine whether Defendant's release is consistent with § 3553(a) factors.  The Court is persuaded that the requested reduction of Defendant's sentence is consistent with consideration of those sentencing factors.

The sentencing factors are: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . [and] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  18 U.S.C. § 3553(a).

In the pending motion, Defendant first argues that his time served properly reflects the seriousness of the offense, promotes respect of the law, and provides adequate deterrence.  (ECF No. 478 at 12.)  Defendant has one prior conviction and was on summary probation when arrested

---

[11] Defendant was committed on August 7, 2001.  (ECF No. 478 at 24.)  As of September 2023, Defendant would have served 265 months of his life sentence.

in this matter.  (*Id.*)  The enterprise at issue involved no violence or claims of violence, but the Defendant admits that the crime involved "an incredibly large amount of methamphetamine."  (*Id.*)  Defendant explains that he has satisfied more than 21.5 years in prison, describing it as a lengthy sentence that supports society's interest in respect for the law and deterrence; none of his codefendants remain in BOP custody; and he has satisfied the guideline range of his plea agreement of 210 to 262 months.  (*Id.*)

Second, Defendant argues that "[j]ust punishment requires nothing more of [Defendant]" because he received no disciplinary infractions throughout the 20 plus years of his prison term and has participated in many educational and skill programs in BOP custody.  (*Id.* at 13-14.)  Defendant completed his GED while incarcerated at USP Atwater.  (*Id.*)  In one of the letters supporting Defendant's compassionate release, Correctional Counselor Lyons described that Defendant has conducted himself in a professional manner, received no incident reports in the ten plus years that he has been at USP Atwater, and then-remained housed in the Honor Unit (a unit reserved for inmates that received no incident reports in the last three years).  (*Id.* at 13-14.)  Counselor Lyons further explained that Defendant has received "the highest work evaluations and monetary bonuses for his hard work and attention to detail."  (*Id.* at 14.)  The Court notes, however, that the Correction Counselor Support Letter is dated August 8, 2013, which suggests that Defendant's behavior and rehabilitation may not stand as of recent.  A ten-year old letter alone does not strongly demonstrate Defendant's effort towards rehabilitation.  On the other hand, the government notably does not dispute that Defendant has received no disciplinary infractions throughout his time at USP Atwater.

Third, Defendant argues that he presents no danger to anyone.  (*Id.* at 14-15.)  Currently, Defendant has an immigration detainer for U.S. Immigration and Customs Enforcement to determine whether he should be deported.  (*Id.* at 14.)  Defendant has prepared plans upon release in both Mexico or the United States, where he would live with his family in either country.  (*Id.*)  Defendant explains that he has financial resources due to his BOP earnings, and his family has offered their full financial and emotional support for Defendant upon release.  (*Id.*)  One of his nieces has offered him a job at her ice cream parlor.  (*Id.* at 14-15.)  Furthermore, the Office of the Federal Defender Social Worker is committed to provide follow-up support and resource assistance

1  to Defendant.  (*Id.* at 15.)

2      In the opposition, the government posits that the nature and circumstances of Defendant's

3  offenses and his characteristics do not warrant compassionate release and does not dispute

4  Defendant's rehabilitation efforts.  (ECF No. 488 at 9.)  The government emphasizes that Defendant

5  financed and controlled multiple properties utilized as methamphetamine conversion labs for the

6  sole purpose of manufacturing large quantities of methamphetamine for distribution from 1993 to

7  1998.  (*Id.*)  The government argues that such nature and circumstances of offenses warrant a life

8  sentence, which reflects the seriousness of the offense, promotes respect for the law, and provides

9  just punishment for the offense.  *See* 18 U.S.C. § 3553(a)(2)(A).

10      The government further contends that the public does not need protection from only violent

11  offenders, but also offenders like Defendant.  (ECF No. 488 at 10.)  The government argues that

12  Defendant introduced "a truly unquantifiable amount of methamphetamine into numerous areas

13  throughout California and beyond," and presented dangers of methamphetamine laboratories, such

14  as physical side effects and major risks of explosion and exposure to toxic waste.  (*Id.*)  The

15  government describes Defendant as one who had access to resources, such as his restaurant business

16  and substantial amount of money won in the lottery, yet still pursued "incredibly egregious and

17  dangerous criminal conduct," even though the conduct was not violent in nature.  (*Id.* at 11.)

18      The Court finds that Defendant's motion to reduce his sentence to time served is warranted

19  in consideration of the § 3553(a) factors.  As an initial matter, the Court notes that the fact that

20  Defendant is currently serving a life sentence of imprisonment does not preclude the Court from

21  granting compassionate release.  *See United States v. Heffington*, 476 F. Supp. 3d 1042, 1053 (E.D.

22  Cal. 2020); *United States v. Amezcua*, No. 1:93-cr-05046-DAD-1, 2022 WL 7693153, at *14 (E.D.

23  Cal. Oct. 13, 2022).  Even before the COVID-19 pandemic, courts recognized that circumstances

24  could warrant the granting of compassionate release even in the case of prisoners serving life

25  sentences.  *See United States v. McGraw*, No. 2:02-cr-00018-LJM, 2019 WL 2059488, at *1-2

26  (S.D. Ind. May 9, 2019) (ordering the compassionate release of a defendant who had served 16

27  years of his life sentence following his conviction for conspiracy to possess with the intent to

28  distribute and distribution of 20 pounds of methamphetamine, and was now 72 years old and

suffering from diabetes, hyperlipidemia, emphysema, stage three kidney disease, and hepatitis C); *United States v. Kubinski*, No. 3:93-cr-00028-H, 2020 WL 2475859, at *1 (E.D.N.C. May 13, 2020) (granting release despite the imposition of four life sentences because the defendant's crimes were for nonviolent drug distribution and conspiracy).

The Court recognizes the seriousness of Defendant's offenses of conviction and agrees that the nature of this offense is one that evinces a danger to the safety of the community. Defendant was convicted of very serious offenses—he led a conspiracy that produced 137 kilograms of methamphetamine for distribution. (ECF No. 478 at 2.) However, for that offense, Defendant has already served 22 years or 265 months in federal prison. (*Id.* at 24.) Considering his demonstrated rehabilitation over the last 22 years in prison, the Court is not persuaded by the government's argument that Defendant poses an ongoing danger to the public. The Court agrees that rehabilitation alone is an insufficient basis upon which to grant compassionate release. Nonetheless, substantial rehabilitation efforts, such as those present in this case, are a relevant consideration which supports the granting of relief.

Furthermore, Defendant's age and length of sentence both suggest that he is at low risk of recidivism. Of the methamphetamine traffickers released at 60 years old and above, only 9.1% of them recidivated. On the other hand, of the methamphetamine traffickers released between the ages of 31 to 40 years old ranges from 46.5% to 52.5% likelihood to recidivate.[12] If the Court grants Defendant's motion, he would be released around age 60, which supports that he is not very likely to recidivate upon release. In the Court's view, a 22-year sentence does reflect the seriousness of Defendant's offenses of conviction, is sufficient to promote respect for the law, and provides just punishment while also affording adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2).

In addition, the Court notes that the docket in this case reflects that Defendant's six out of seven co-defendants were also sentenced to terms of imprisonment, and none of those co-

---

[12] *See* Louis Reedt, *Recidivism Among Federal Drug Trafficking Offenders*, UNITED STATES SENTENCING COMMISSION 1, 90 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170221_Recidivism-Drugs.pdf#page=85.

defendants remain in BOP custody today.  Specifically, according to the docket and the BOP's inmate locator website, co-defendant Jose Gustavo Quiroz received a 120-month term of imprisonment and was released on November 15, 2007; co-defendant Raul Chavez received a 360 month term of imprisonment and was released on August 10, 2018; co-defendant Ramiro Perez received an 87 month term of imprisonment and was released on August 3, 2004; co-defendant Jesus Manuel Quiroz received a 108 month term of imprisonment and was released on December 14, 2020; co-defendant Jesus Arzate Espinoza received a term a 24 month term of imprisonment and was released on September 27, 2002; and co-defendant Felipe Alvarez received a 70 month term of imprisonment and was released on June 8, 2005.  (ECF Nos. 210, 215, 230, 243, 266, 315, 372.)  Thus, granting Defendant's requested relief would not result, in the Court's view, in a sentencing disparity among his co-defendants because he has already served a term of imprisonment significantly longer than the terms of imprisonment served by his co-defendants— an appropriate result given Defendant's greater level of culpability as a leader of the drug trafficking conspiracy.  *See United States v. Amezcua*, No. 1:93-cr-05046-DAD-1, 2022 WL 7693153, at *15 (E.D. Cal. Oct. 13, 2022).

Thus, on balance, the Court finds that granting Defendant's motion and reducing his sentence to one of time served is consistent in consideration of the § 3553(a) sentencing factors.

## CONCLUSION

Defendant Quiroz successfully demonstrated that an "extraordinary and compelling" reason exists justifying a reduction of his sentence under 18 U.S.C. § 3582 (c)(1)(A), and Defendant successfully demonstrated that a reduction at this time would be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).  Therefore, his motion for compassionate release, (ECF No. 474), is GRANTED.

Accordingly,

1.  Defendant Quiroz's motion for compassionate release, (ECF No. 474), is granted;

2.  Defendant's sentences on Counts One through Twenty-Nine of life terms of imprisonment to be served concurrently, are reduced to a sentence of time served as to each of those counts;

18

3. Defendant's previously imposed 60-month term of supervised release is imposed and shall remain in full force and effect, that is upon Defendant's release from imprisonment, he will be placed on supervised release for a term of 60 months on Count One, 60 months on Count Two, 60 months on Count Eight, 60 months on Count Nine, 60 months on Count Ten, 60 months on Count Eleven, 60 months on Count Twelve, 60 months on Count Thirteen, 60 months on Count Fourteen, 60 months on Count Fifteen, and 60 months on Count Twenty-Nine, all to be served concurrently for a total term of 60 months, which will become unsupervised if Defendant is deported, under the following special and standard conditions:

    a. Within 72 hours of release from the custody of the Bureau of Prisons, Defendant must report in person to the probation office in the district to which he is released.

    b. While on supervised release, Defendant must not commit another federal, state, or local crime and shall not illegally possess controlled substances. Defendant must cooperate in the collection of DNA as directed by the probation officer and shall comply with the standard conditions which have been recommended by the United States Sentencing Commission and adopted by this Court as set forth below.

    c. Further, Defendant must refrain from unlawful use of a controlled substance. Defendant must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

**SPECIAL CONDITIONS OF SUPERVISION**

    d. Defendant must submit his person, property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer or any law enforcement officer at any time, based upon reasonable suspicion of unlawful conduct or a violation of a condition of supervision, without a search warrant. Failure to submit to a search may be grounds for revocation. Defendant must warn any other occupants that the premises may be subject to searches pursuant to this

1    condition.

2    e.   Defendant must submit to substance abuse/alcohol abuse testing to determine if he

3         has used a prohibited substance.  Defendant must not attempt to obstruct or tamper

4         with the testing methods.

5    f.   Defendant must provide the probation officer with access to any requested

6         financial information and authorize the release of any financial information.  The

7         probation office may share financial information with the U.S. Attorney's Office.

8    g.   If Defendant is deported, excluded or allowed to voluntarily return to his country

9         of origin, he must remain outside the United States, unless legally authorized to re-

10        enter.  If he re-enters the United States, he must report to the nearest probation

11        office within 72 hours after his return; supervision is waived upon deportation,

12        exclusion, or voluntary departure.

13   h.   Defendant must possess and use only those cellular phones and phone numbers

14        (including Voice over Internet Protocol [VolP] services) that have been disclosed

15        to the probation officer upon commencement of supervision.  Any changes or

16        additions are to be disclosed to the probation officer prior to the first use.

17   i.   Defendant must participate in a co-payment plan for treatment, testing and/or

18        medication and shall make payment directly to the vendor under contract with the

19        United States Probation Office.  Defendant's co-payment will be determined

20        utilizing a Sliding Fee Scale based upon defendant's disposable income.

21                        **STANDARD CONDITIONS OF SUPERVISION**

22   j.   Defendant must report to the probation office in the federal judicial district where

23        he is authorized to reside within 72 hours of release from imprisonment unless the

24        probation officer instructs Defendant to report to a different probation office or

25        within a different time frame.

26   k.   After initially reporting to the probation office, Defendant will receive instructions

27        from the Court or the probation officer about how and when Defendant must report

28        to the probation officer, and he must report to the probation officer as instructed.

20

l.   Defendant must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the Court or the probation officer.

m.   Defendant must answer truthfully the questions asked by the probation officer.

n.   Defendant must live at a place approved by the probation officer.  If Defendant plans to change where he lives or anything about his living arrangements (such as the people he lives with), he must notify the probation officer at least 10 days before the change.  If notifying the probation officer in advance is not possible due to unanticipated circumstances, Defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

o.   Defendant must allow the probation officer to visit him at any time at his home or elsewhere and must permit the probation officer to take any items prohibited by the conditions of Defendant's supervision that the probation officer observes in plain view.

p.   Defendant must work full time (at least 30 hours per week) at a lawful type of employment unless the probation officer excuses him from doing so.  If Defendant does not have full-time employment, he must try to find full-time employment, unless the probation officer excuses him from doing so.

q.   If Defendant plans to change where he works or anything about his work (such as his position or his job responsibilities), Defendant must notify the probation officer at least 10 days before the change.  If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, Defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

r.   Defendant must not communicate or interact with someone he knows is engaged in criminal activity.  If Defendant knows someone has been convicted of a felony, Defendant must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

s. If Defendant is arrested or questioned by a law enforcement officer, he must notify the probation officer within 72 hours.

t. Defendant must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

u. Defendant must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

v. If the probation officer determines that Defendant poses a risk to another person (including an organization), the probation officer may require Defendant to notify the person about the risk and Defendant must comply with that instruction. The probation officer may contact the person and confirm that Defendant has notified the person about the risk.

w. Defendant must follow the instructions of the probation officer related to the conditions of supervision.

IT IS SO ORDERED.

Dated:   September 19, 2023   _____

UNITED STATES DISTRICT JUDGE